In the Matter of Richard T. HYDEN, Debtor.

GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff,

v.

Richard T. HYDEN and George Ledford, Trustee, etc., Defendants.

Bankruptcy No. 3–80–01393.
Adv. No. 3–80–0308.

United States Bankruptcy Court,
S. D. Ohio,
Western Division.

Dec. 10, 1980.

Daniel A. Nagle, Kettering, Ohio, for plaintiff.

Donald F. Harker, III, Dayton, Ohio, for defendant.

George Ledford, Englewood, Ohio, Chapter 13 Trustee.

Lloyd D. Cohen, Dayton, Ohio, amicus curiae.

ELLIS W. KERR, Bankruptcy Judge.

## FACTS

Richard T. Hyden, the Debtor, filed a petition under Chapter 13 of Title 11 U.S.C. His plan proposed $100.00 monthly payments for 36 months.

General Motors Acceptance Corporation (GMAC), the Plaintiff, is a secured creditor. Its security is a 1976 Plymouth Fury.

On the date of the filing of the petition the value of the auto was $1,738.00 (agreed). Net payoff of obligation to GMAC was $2,456.10, and gross outstanding balance was $2,894.10.

## ISSUES

It is agreed there are only two issues:

1. Whether GMAC is entitled to interest on the allowed amount of its secured claim.

2. If GMAC is entitled to interest how is the amount determined.

## PRELIMINARY OBSERVATIONS

The Bankruptcy Code section which is the basis for the issues is 11 U.S.C. § 1325. The pertinent parts are:

"The Court shall confirm a (Chapter 13) plan if—

(1) The plan complies with the provisions of this chapter and with other applicable provisions of this title; (and)

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of the claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the Debtor surrenders the property securing such claim to such holder."

The Attorneys who have filed briefs in this case consider it a "test case". Action is being delayed in other pending cases awaiting this decision. All Attorneys desire "guidelines" for future action. This opinion is prepared with this in mind. The result will be more detailed comment of matters not necessarily pertinent to the instant case—only dicta.

The issues as stipulated by the parties refer to "interest" as being in question. The Court questions this as properly descriptive of what is actually contemplated as will later be explained.

## FINDINGS

After the Bankruptcy Code was adopted many Attorneys reading it for the first time "took a double-take" when examining Section 1325(a)(5)(B)(ii) as to value of *"property to be distributed"*. (emphasis added)

Why, it was asked, didn't it say "amount of money to be distributed"? We deem it best to start with this to make our comments.

The best explanation we have found is in 5 Collier on Bankruptcy, ¶ 1325.01 (1325–24) (15th ed. 1980) where it is stated:

"The phrase 'property to be distributed under the plan' plainly and significantly indicates that cram down may be accomplished in a chapter 13 plan merely by proposing to distribute property during the course of the extension period, whether property of the estate in existence at the date of confirmation, either exempt property or other property of the estate, or deferred cash payments representing future earnings or income of the chapter 13 debtor, provided the *present dollar value* at confirmation of the property to be distributed in the future equals the amount of the allowed secured claim. 'Property' is not a defined term, but it is altogether unrestricted in scope and unquestionably encompasses any and all kinds of property of the estate and property of the debtor 'to be distributed under the plan.' The phrase is not limited in its application to property in existence at the date of confirmation, but may and usually will include deferred payments from future earnings or income of the debtor. The crucial import of the phrase 'property to be distributed under the plan' lies in its connotation of permission to satisfy allowed secured claims through future distributions of property of equivalent present value."

The Code was intended to cover many situations. It had to be general in the use of words. Cases vary as to types of security—from autos to heavy duty machinery. They vary as types of security agreements—Installment Sales Contracts as to which Ohio interest law applies and other kinds of security agreements. The method of determining the value of property to be distributed could vary depending upon the kind of security and the type of the security agreement.

## LEGISLATIVE HISTORY

A precise question in the instant case is what is the meaning of the phrase "the value, as of the effective date of the plan" in § 1325(a)(5)(B)(ii)? Does the language indicate that an actuarial "present value" is to be used in computing the amount of property to be distributed under the plan or does the phrase simply fix the time for valuation to take place?

When a statute contains ambiguous language it is obviously both permissible and necessary to examine the legislative history of that statute.

Although the legislative history of § 1325 is brief, the term "present value" does in fact appear in that history.

" . . . the secured creditor's lien only secures the value of the collateral and to the extent property is distributed of a *present value* equal to the allowed amount of the creditor's secured claim the creditor's lien will have been satisfied in full." (emphasis added) 124 Cong. Rec. H 11,107 (Sept. 28, 1978); S 17,1423 (Oct. 6, 1978)

Use of the term "present value" creates an initial impression that Congress contemplated a time-value analysis of the secured claim. There is more legislative history which confirms this view.

The legislative history to Chapter 11 of the Bankruptcy Code also discusses the matter of value. It might appear that the Court is straining to reach a result by using the Chapter 11 history or making a serious conceptual error in attempting to find an interplay between Chapters 11 and 13. There are, however, at least three very valid reasons for examining the legislative history to Chapter 11.

1. "The fair and equitable rule running through all reorganizations or rehabilitation proceedings is controlling as to Chapter 13 secured claim holders and debtors . . ." (*In Re Anderson*, 6 B.R. 601, Bkrtcy.S.D.Ohio)

2. If an identical phrase appears in both Chapters 11 and 13 (e. g. "value, as of the effective date of the plan") it is not unreasonable to assume that the legislative history interpreting such phrase is relevant, regardless to which Chapter the legislative history may be appended.

3. The legislative history of § 1325(a)(5)(B) makes a direct reference to Chapter 11.

"To this extent, a secured creditor in a case under Chapter 13 is treated identically with a recourse creditor under § 1111(b)(1) of the House amendment, except that the secured creditor under Chapter 13 may receive any property of a value as of the effective date of the plan equal to the allowed amount of the creditor's secured claim rather than being restricted to receiving deferred cash payments." 124 Cong.Rec. H 11,-107 (Sept. 28, 1978); S 17,423 (Oct. 6, 1978)

Turning to the legislative history of § 1129 we find two significant passages: "Specifically, the court may confirm a plan over the objection of a class of secured claims if the members of that class are unimpaired or if they are to receive under the plan property of a value equal to the allowed amount of their secured claims, as determined under proposed 11 U.S.C. § 506(a). *The property is to be valued as of the effective date of the plan, thus recognizing the time-value of money.*" (emphasis added) H.R.No.95-595, 95th Cong., 1st Sess. (1977) 413, U.S. Code Cong. & Admin.News 1978, 5963, 6369.

"Application of the test under subparagraph (A) also requires a valuation of the consideration 'as of the effective date of the plan.' *This contemplates a present value analysis that will discount value to be received in the future.*" (emphasis added) (citation as above)

This is a clear and distinct manifestation of Congress' understanding of the phrase "value, as of the effective date of the plan" under Chapter 11.

Could Congress have envisioned a different meaning for the exact same phrase under Chapter 13? Of course it could have, but the Court has found nothing in the legislative history to indicate a different meaning was intended. And in fact, as mentioned, the legislative history to § 1325 uses the term "present value". The logical inference is that "value, as of the effective date of the plan" (appearing in both § 1129 and § 1325) means the same thing in both places in the Code, specifically a present-value computation.

The Debtor in the instant case has contended that § 506(b) refers to payment of "interest" on oversecured claims only and therefore no "interest" is permitted an undersecured creditor. The Court believes that the term "interest" in § 506(b) is used in its more common every day manner and not as a method of calculating present-value. If Debtor's reasoning is valid, then neither undersecured nor unsecured creditors would be entitled to have their claim subjected to a present-value calculation under Chapter 11. Such is not the case.

Parenthetically, the Court while not wishing to become bogged down in the intricacies of Chapter 11 at this time, feels compelled to point out a misleading section of the legislative history to § 1129. Immediately following the preceding excerpt of the legislative history set out above, three illustrations of present value analysis are given.

One example states that in satisfying an allowed secured claim of $1,000 *in a class by itself* the Debtor could propose to give a note with a $1,000 face amount due five years after the effective date of the plan. This would warrant confirmation because the present value will *never exceed* the allowed amount of the secured claim.

Obviously this example is directly contra to this Court's interpretation above. The three examples, however, are in the legislative history which pertains to H.R.8200. Specifically H.R. contained the following language with respect to each *class* of secured claims:

§ 1129(b)(1)(A) "each holder of a claim of such class will *not* receive or retain under the plan on account of such claim property of a value as of the effective date of the plan, *greater than the allowed amount of such claim* ;" (emphasis added)

It can be seen then that the concern was with *not exceeding* the allowed amount of

the claim. It is equally important to observe that a present-value analysis was still conducted to make this determination.

For reasons not relevant to Chapter 13, the above provision of the statute was amended so that the criteria for confirmation is in terms of receiving *at least* as much as the value of the allowed amount. Thus, the Court does not believe the three examples set out in the legislative history, particularly the example discussed above, would be treated in the same manner. A later statement by Congress confirms this view:

> "Except to the extent of the treatment of secured claims under subparagraph (A) of this statement, the House report remains a description of confirmation of section 1129(b)" 124 Cong.Rec.H 11,103 (Sept. 28, 1978); S 17,420 (Oct. 6, 1978)

In short, the Court finds that the legislative history of the Bankruptcy Code provides for a "present value test" when applying the confirmation standards of § 1325.

We find that applying the legislative history to issue one results in an answer that GMAC is entitled to "interest" on the allowed amount of its secured claim.

### CASE LAW

Relevant cases are:

*In re Lum*, 1 B.R. 186 (Bkrtcy.E.D.Tenn. 1979)

*In re Crockett*, 3 B.R. 365 (Bkrtcy.N.D. Ill.)

*In re Williams*, 3 B.R. 728, 6 B.C.D. 237 (N.D.Ill.1980)

*In re Ziegler*, 6 B.R. 3, 6 B.C.D. 194 (S.D.Ohio 1980)

*In re Smith*, 4 B.R. 12, 6 B.C.D. 424 (E.D.N.Y.1980)

*In re Miller*, 4 B.R. 392, 6 B.C.D. 410 (S.D.Cal.1980)

*In re Anderson*, 6 B.R. 601 (Bkrtcy.S.D. Ohio)

> (*Lum* is a 1979 case. The others are 1980)

The August 1 Brief of Plaintiff cites *Lum, Ziegler*, and *Smith*.

The August 4 Memo of Trustee cites all of above mentioned cases except *Anderson*.

The Debtor's August 11 Memo of Law and the Amicus Curiae Brief of August 15 cite all except *Anderson* and *Miller*.

The Court is indebted to all the Attorneys for excellent analysis and comment as to each cited case.

Bankruptcy Judges have used various reasons to reach their conclusions as to the rates or interest to be applied. The arguments in the Briefs in the instant case are persuasive. We deem it unnecessary to give detailed remarks as to arguments of counsel or conclusions of other Courts. One thing stands out. The rates (or "interest") are arbitrary—and necessarily so. We are in a virgin field of case law. Variety is best illustrated by short comments pertaining to the following cases previously cited.

However, comment should first be made that facts in these other cases are not all the same as in the instant case; that although this decision will necessarily be restricted to what is necessary in this case, the opinion will attempt to include what might be considered guidelines for other cases, as requested.

A problem confronting the Court in the instant case is that no evidence was presented to shed light on a workable procedure to establish a present value for use in Chapter 13 proceedings, generally.

*Lum* took into account discount money to be received in the future and set "interest" rate at 10%, describing it as "at best a rough approximation." Consideration was given to the contract, state law, and economic concerns.

*Crockett* allowed a rate of interest of 9%, added to the fair market value, deemed to be wholesale value. Debtors, the Court stated, in seeking retention of property cannot insist on liquidation values to be paid to creditors in installments—they "cannot eat with the hounds and run with the hares".

*Williams* refused confirmation because value to be distributed would be less than would be paid if liquidated under Chapter 7. The opinion is replete with lists of creditors,

amounts of claims and proposed payments, none of which would be pertinent to the instant case.

*Ziegler* pointed out that collateral valuation as of date of petition is not worth so much when paid over a period of time as instant payment and allowed a rate based on IRC ¶ 6621.

*Smith* stated Congress intended Courts would fix a discount rate and proceeded to find discount rate and contract rate equivalent and denied confirmation because plan did not provide for paying the creditor the "extra" in addition to present collateral valuation.

*Miller* held 12 per cent rate appropriate; that creditor is not entitled to full retail value nor to interest at prevailing prime rate; that collateral had been valued at amount greater than creditor would have realized if collateral had been repossessed.

*Anderson* held that if the dividends on the unsecured portion of the claim do not effect the indubitable equivalence the property should be reappraised or value otherwise resolved as soon as the Trustee completed all payments under the plan. In *Anderson,* the value of the collateral was not greater than the amount of creditor's claim and would not have been entitled to interest in a liquidation proceeding.

We comment at this point that the difficulty of applying the indubitable equivalent principle to give adequate protection as provided in 11 U.S.C. § 361 is that in attempting to determine a proper "rate", the less indubitable is the result. We arrive at a situation recognized in the legislative history where it is stated:

> "These matters are left to case-by-case interpretation and development. It is expected that the Courts will apply the concept in light of facts of each case and general equitable principles". (underlining added) House Report No. 95–595, 95th Cong., 1st Sess. (1977) 338–40, U.S. Code Cong. & Admin.News 1978, p. 6295.

Thus, the result of the different bases used by Bankruptcy Judges in arriving at their decisions described in some opinions as merely rough estimations.

The attempt to arrive at a rate or formula has resulted in much discussion. One suggestion (not yet included in any reported decision) is that rather than computing the present worth of proposed payments, it is simpler to in effect work the equation from the other side, i. e. knowing the amount of the secured claim, determine the minimum amounts of payments necessary. This may be done by simply adding "interest" to the amount of the claim. The procedure is just as valid whether one works from a known present value to an unknown stream of payments or from a known stream of payments back to an unknown present value, so long as the interest rate and discount rate are the same. The question is what discount (or interest rate) to use.

Such types of suggestions and the opinions in the cases cited emphasize the lack of uniformity and the need for corrective legislation or upper Court decisions establishing definite criteria.

■ The present-value task in Chapter 13 is basically that of determining what the present value or present worth is of a proposed stream of fixed payments (usually for 36 months). To do this the payments are "discounted" to determine their present value. The present value may then be compared with the amount of the allowed secured claim. If the present value of these deferred payments is not less than the amount of the secured claim there is compliance with § 1325(a)(5)(B)(ii).

Present value depends on, among other things, what is done with the property. Investing money in a savings account, a certificate of deposit or the money market, for example, provides differing rates of interest. Also the interest rates themselves fluctuate on each of these items.

While admitting that the process of determining the correct discount rate is a rough approximation, it is not necessarily an arbitrary or capricious exercise. Although the determination of the discount rate cannot be conducted with scientific precision, a judge should not abandon the

task altogether and simply not choose an interest rate, a discount rate, a formula, or whatever it should be called.

Plaintiff contends that the maximum legal rate of interest in Ohio is the proper discount factor, while Debtor maintains that the maximum rate permitted on judgments in Ohio is the touchstone. Neither rate in the Court's opinion, bears a direct relationship to the value of money in the market place or in arm's length transactions.

The use of the word "interest" is misleading. There can be many criteria in determining the value in question. Interest rate and discount rates are among these criteria. But they are no doubt best for converting to a realistic, specific formula to determine value.

We disapprove of a formula which requires re-examination or re-evaluation during the period of payments under the plan. It would increase administrative burden and could result in indefiniteness that would do more harm than good.

We do not agree with the contention that secured creditors are no more entitled to "interest" than unsecured creditors. The difference is so obvious as to require no further comment.

We do not agree with the contention of secured creditors that they should be allowed the full amount as provided in their contracts. The Code is replete with examples of Bankruptcy adversely affecting creditors—"cram down", avoidance of lien, redemption, stay are but several examples. The determination of the value question in issue must be made to reach a result that is fair and equitable for both creditor and debtor. If collateral has a high rate of depreciation the payments to the secured creditor should give him (or her, or it) necessary protection. Setting an arbitrary rate to apply to all cases might not give such protection. Further, in such situations the allowance of only the Ohio legal rate of interest (the interest when not stipulated) would be unfair to the creditor and give undue advantage to the debtor.

In Ohio the criteria to determine value should include the type of instrument which is the basis for the debt because of the various interest rates applying to different types of debts.

We do not agree with the contention that a contract no longer exists. Even clauses in contracts providing for termination because of Bankruptcy are invalidated by Section 365(e) of the new Code. But even if it were determined that the contractual relation had ceased there is nothing to prevent the Court from taking into consideration the interest which had been set out in the contract.

In the instant case, if GMAC were to repossess and on sale secure what is the stated agreed value it could make an Installment Sales contract loan at Installment Sales contract interest rates. If it were not for the Chapter 13 it would be entitled to the contract rate, and in the event of default, repossession and sale and deficiency judgment the interest would be that set by Ohio law. But there is no repossession, sale or deficiency judgment. The debtor retains the security. There is nothing submitted that would permit a finding of whether, if there were liquidation, unsecured creditors would receive more or less than in distribution under the plan, be the "interest" granted GMAC 6% or 18%. What would be fair to both unsecured and secured creditors should, if possible, be a definite formula, rate, interest, or whatever it should be named. An average based upon specific criteria would best attain this result.

To include Ohio interest rates in the criteria presents problems. R.C. 1343.03 applies when rate is not stipulated. There would be very few, if any cases in value determination, cases of the type now under consideration where there would be no stipulated interest. To be realistic, this section should not be included in the criteria as "interest".

R.C. 1343.02 applies to instruments with interest in accordance with Section 1343.01. Computation is made at the rate specified in the instrument. But Installment Sales contracts are governed by R.C. 1317.06, not 1343.01.

Economic factors should be considered. Their importance is reflected in amendments to Ohio interest rates. Recognition should be given to Ohio placing Installment Sales contracts in a different status. Criteria should also take this into consideration. To do this it would seem reasonable to make a computation which includes maximum interest rate and contract rate but use a leveling factor of an arbitrary 6%.

If other than an Installment Sales contract is under consideration a reasonable (although admittedly arbitrary) basis would be the average of the contract rate and the maximum authorized by O.R.C. 1343.01.

## CONCLUSIONS

■ 1. GMAC is entitled an amount in addition to the allowed amount of its secured claim.

2. The amount is to be determined by computation as of interest by taking the average of the following three: (1) 6%, (2) the interest in effect in Ohio as to Installment Sales contracts, and (3) the interest rate stated in the contract. (the "annual percentage rate")

■ 3. As dicta only but as a guideline in other cases the value to be paid shall be the value of the security as of the date of filing the petition, plus:

(a) If the contract is not an Installment Sales contract the average of the contract rate and that interest provided by Ohio Revised Code 1343.01.

(b) If no interest is stated in the contract then the interest provided by the Ohio Revised Code section 1343.01.